**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 12-cv-02570-MSK-CBS

**ADELPHIA COMMUNICATIONS CORPORATION,**

       **Plaintiff,**

**v.**

**QUANTA SPECIALTY LINES INSURANCE COMPANY,**

       **Defendant.**

---

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY
JUDGMENT**

---

**THIS MATTER** is before the Court on the parties' Joint Motion for Judgment (**# 28**).  In

determining this matter, the Court has considered the written arguments of the parties, including

both parties' briefs in support of the joint motion (**# 29** and **30**), and both parties' responses (**# 31**

and **32**).

## I.       Background

This is an action for determination of scope of coverage under the terms of a "claims

made" insurance policy.  No dispositive motions were filed, and on December 11, 2013, the

Court held a Final Pretrial Conference.  Based on the proposed Final Pretrial Order and colloquy

with the parties, it appeared that no material facts were in dispute and that only legal issues

required determination.  At the Court's invitation, the parties filed the Joint Motion for

Judgment.

Having reviewed the Motion, along with accompanying briefs, stipulated facts and attached documents, it appears that there may be disputed material facts that will require a trial. Accordingly, the Court treats the Motion as one requesting summary judgment pursuant to Fed. R. Civ. P. 56, and makes those legal determinations that can be made at this juncture.

## II.    Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiff Adelphia Communications Corporation ("Adelphia") is a Delaware corporation with its principal place of business in Denver, Colorado. Defendant Quanta Specialty Lines Insurance Company ("Quanta") is an Indiana company with its principal place of business in New York, New York. Adelphia alleges that it has suffered damages of more than $250,000.

## III.    Material Facts[1]

Adelphia filed for bankruptcy under chapter 11 of the United States Bankruptcy Code in June 2002. In December 2003, Adelphia's insurance broker provided Quanta with a schedule identifying approximately 1,800 locations that Adelphia sought to insure under an environmental site protection policy. Quanta agreed to insure Adelphia for environmental hazards on the listed parcels. Among these was a property in Waterbury, Connecticut (the "Waterbury Property").

In 2005, Adelphia and Quanta renewed the policy, amending it to include additional coverage ("Coverage A.1"), pursuant to which Quanta was obligated to:

> pay loss that the Insured is or becomes legally obligated to pay as a result of a claim for bodily injury, property damage or remediation costs, resulting from a pollution incident that commenced prior to [January 1, 2000], and is at, on, under or migrating beyond the boundaries from the scheduled location, provided such claim is first made against the Insured and reported to the Company in writing during the policy period or any applicable extended reporting period[.]

---

[1]    The parties have stipulated (# 28) to the facts and exhibits relevant to the legal determinations made herein. The Court summarizes pertinent facts here, but elaborates, as necessary, in its analysis.

The term of the policy, including this coverage, was eventually extended until September 1, 2006. An extended reporting period continued until November 1, 2006.

In April 2005, Adelphia entered a contract to sell the Waterbury Property. Adelphia engaged ENVIRON International Corporation ("Environ") to provide an environmental audit prior to sale. By December 13, 2005, Environ determined that the Waterbury Property had been used as a vehicle body repair shop sometime after 1967. This fell within the definition of an "establishment" within the meaning of the Connecticut Property Transfer Act, C.G.S.A. § 22a-134, *et seq.*

The Connecticut Act prohibited transfer of "an establishment except in accordance with" the Act's provisions, which included certification that a parcel had been investigated regarding potential discharge of hazardous waste and, if necessary, that any discharge had been, or would be, remediated. §§ 22a-134 & 22a-134a.

Environ completed Phase I of the Assessment, then recommended that a Phase II investigation be performed. In an April 2006 letter to Adelphia, Environ wrote:

> Since the property will be subject to the Connecticut Transfer Program upon its sale, and since we have recognized Areas of Concern (AOC's) at the property (i.e., locations where releases of hazardous substances may have occurred), Phase II investigations will be required to meet the requirements of the Transfer Program. While the program allows two years after the transfer for completion of site investigations, there can be a significant benefit to completing these actions prior to property transfer. Particularly, if no actionable contamination is found, then upon transfer Adelphia would have to file a so-called Form I certification with Connecticut Department of Environmental Protection (DEP), and no further action would be necessary. Otherwise, a Form III would have to be filed, which states that site conditions are unknown and that Adelphia or the buyer accepts responsibility for the investigation and remediation of the property, and which triggers the filing of a schedule for investigation and remediation and submission of reports. In reaction to the filing of a Form III and the required Environmental Condition Assessment Form (ECAF) that accompanies it, DEP determines whether it will retain oversight of the investigation and remediation of the property, or if a Licensed Environmental professional (LEP) may oversee and verify the work.

On July 21, 2006, Environ delivered a Phase I/II Environmental Site Assessment Report to Adelphia.  The Report revealed that "soil contamination due to on-site releases of hazardous substances or petroleum products is present at five of the AOCs [areas of concern], with certain substances exceeding regulatory criteria."  Adelphia then submitted an Environmental Condition Assessment Form ("ECAF") and a Transfer of Establishment Form III to the Connecticut Department of Environmental Protection.

On September 27, 2006, Adelphia sent Quanta an Updated Environmental Site Protection Application that included information concerning the Waterbury Property.  The Application stated that "[r]eports have been submitted to the CT Department of Environmental Protection" regarding the Waterbury Property, "and we are awaiting a response from the State."  On October 27, 2006, Adelphia sent a letter to Quanta regarding "our notice to you of two potential claims"[2], reflecting that the Waterbury Property:

> was operated as a vehicle body repair facility until 1982 and would likely have involved the use of paint products, cleaning solvents such as mineral spirits, ketones, alcohols, chlorinated VOC's, and vehicle related fluids, such as lubricating oil, brake fluid, body fillers, and grinding wastes.  The Phase II report recommended additional investigation.  Reports have been submitted to the Connecticut Department of Environmental Protection, and we are awaiting their response.  At this time we do not know what the State might require and therefore cannot provide any estimate of potential remediation costs.

Three days later, Quanta's Director of Environmental Claims prepared an Environmental Claim Summary listing the Waterbury Property.

By a letter dated November 17, 2006, however, Quanta denied "any present or future obligation with respect to the matters disclosed in" the October letter.

---

[2] The policy defines "potential claim" to mean "a pollution incident that commenced on or after the inception date of this Policy that the insured reasonably expects may result in a claim", but the parties agree that the definition is not binding with regard to the either the factual or legal issues before the Court.  The Court understands this to mean that there is no legal significance to the use of the phrase in correspondence between the parties.

Unable to resolve their dispute as to coverage, Adelphia initiated this action against

Quanta. It asserts a breach of contract claim and seeks a declaratory judgment of coverage under

the policy for the remediation costs at the Waterbury property.

## IV.  Analysis

The Joint Motion for Judgment presented the following two issues for resolution by the

Court:

> (1) Whether a "claim" was made against Adelphia during the Policy period; and
> (2) Whether Adelphia substantially reported "the claim" to Quanta during the
> Policy period or the extended reporting period.

To interpret an insurance policy, the Court's "starting point is, of course, the intent of the

parties as manifested by the plain language of the policy." *Simon v. Shelter Gen. Ins. Co.*, 842

P.2d 236, 239 (Colo. 1992).[3]  In other words, the Court construes the policy language not as the

insurer may have intended it to mean, but according to what the ordinary reader and purchaser

would have understood it to mean. *Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co.*,

35 F.3d 494, 496 (10th Cir.1994). The Court must consider the policy as a whole. *Simon*, 842

P.2d at 239.

When terms in a policy are susceptible to more than one reasonable interpretation, the

Court must construe the ambiguous term against the drafter – the insurer – and in a manner that

would promote, rather than deny, coverage. *Blackhawk–Central City Sanitation Dist. v. Am.*

*Guarantee & Liab. Ins. Co.*, 214 F.3d 1183, 1191 (10th Cir. 2000). However, a term is not

ambiguous simply because the parties disagree as to its meaning, or because hypothetical or

abstract sets of facts create the potential of ambiguity. *Allstate Ins. Co. v. Juniel*, 931 P.2d 511,

---

[3]      The substantive law of the forum state governs the analysis of an underlying claim where
the Court has diversity-based jurisdiction. *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th
Cir. 1995). Because the parties' briefs assume applicability of Colorado law, the Court operates
under the same assumption. *See, e.g.*, *Grynberg v. Total, S.A.*, 538 F.3d 1336, 1346 (10th Cir.
2008).

513-14 (Colo. Ct. App. 1996).  Adelphia concedes that it has the burden to establish both that a claim was made against it, and that it substantially complied with the policy's reporting provision.

### A.  Making "the Claim"

The first issue that the parties raised for resolution by the Court is "[w]hether a 'claim' was made against Adelphia during the Policy period."  This, in turn, requires a determination of what a "claim" is.  To answer that question, the Court turns to the language of the policy.  It defines a "claim" as a "written demand or written notice asserting liability or responsibility on the part of the insured."[4]  Thus, the question is whether Adelphia received a written notice asserting its "liability or responsibility", and if so, when such notice occurred.

Adelphia argues that Environ's Phase I/II Environmental Site Assessment Report (the "Report") was a written notice sent to Adelphia, and asserting Adelphia's responsibility, during the policy period.  The stipulated facts confirm that the Report was delivered to Adelphia on or about July 21, 2006, and that the policy term extended to September 1, 2006.  Thus, Adelphia argues, the claim was made during the policy period.

Quanta argues, among other things[5], that the Report did not clearly state that Adelphia was responsible or liable for any loss or remediation.  Instead, it simply suggested more

---

[4]     Quanta asserts that the policy is not ambiguous, yet seeks to augment the definition of the term "claim" in the policy by reference to caselaw defining the word in the context of other insurance policies and a subsection of the policy that was "deleted in its entirety" by an endorsement.  These are not relevant to the court's determination.  "When the parties give contractual terms specific meanings, those provisions should control."  *State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 391 (Colo. 1997) (Vollack, C.J., dissenting); *see id.* at 387 (majority op.).

[5]     Quanta raises arguments concerning the implied covenant of good faith and fair dealing, the location of the pollution, and a provision for coverage that was not selected, that do not bear on the narrow legal issues before the Court.

6

investigation, and left open the possibility that Connecticut could assess remediation obligations in the future.

Admittedly, the Report's language is not a model of clarity.  It does not state expressly that Adelphia was "liable" for any loss or remediation, but liability is not the *sine qua non* of a claim.  Another basis for a claim is the assertion of "responsibility" for potential contamination. That is the question, here.

The Report states that investigations "demonstrated that there have been releases at AOCs [areas of concern]" at the Waterbury Property, and that "[s]ome of the contaminant levels determined for soil at the site exceed applicable criteria."  The Report also recommends that a "Form III filing would be appropriate for compliance with the Transfer Program requirements", and advises that "[t]he Form III filing entails a certification by the transferor that a release has occurred at the property, based upon an investigation conducted in accordance with prevailing standards and guidelines."

The Report is best understood in the context of the Connecticut Property Transfer Act (the "Act").  The Act "subjects transferors of 'establishments' to reporting, investigation and remediation requirements that depend on the environmental condition of the property being transferred."  *Ne. Ct. Econ. Alliance, Inc. v. ATC P'ship*, 861 A.2d 473, 490 (Conn. 2004).  An "establishment" is, for relevant purposes, real property at which "a vehicle body repair facility was located on or after May 1, 1967."  § 22a-134(3).  To comply with the reporting requirements in transferring an establishment, "[t]he transferor makes the report on one of several forms, which are defined terms under the statute as Forms I, II, III and IV."  *Ne. Ct. Econ. Alliance, Inc.*, 861 A.2d at 490.  Form III is a written certification which

> states that (A) a discharge, spillage, uncontrolled loss, seepage or filtration of
> hazardous waste or a hazardous substance has occurred at the establishment or the

7

environmental conditions at the establishment are unknown, and (B) that the person signing the certification agrees to investigate the parcel in accordance with prevailing standards and guidelines and to remediate pollution caused by any release of a hazardous waste or hazardous substance from the establishment in accordance with the remediation standards.

§ 22a-134(12).  Form III requires the transferor of property to certify that "'to the extent necessary to minimize or mitigate a threat to human health or the environment, I shall contain, remove, or otherwise mitigate the effects of any discharge, spillage, controlled loss, seepage, or filtration of hazardous waste at the site of [the] establishment in accordance with procedures and a time schedule approved by the Commissioner of Environmental Protection.'"  *Ne. Ct. Econ. Alliance, Inc.*, 861 A.2d at 490.  "Form III legally obligate[s]" the company that makes the certification "to investigate and to remediate any pollution found on land about to be transferred," regardless of who initially caused the contamination.  *ATC P'ship v. Coats N. Am. Consol., Inc.*, 935 A.2d 115, 124 n.14 (Conn. 2007).  Failure to comply with the relevant portions of the Act "entitles the transferee to recover damages from the transferor, and renders the transferor of the establishment strictly liable, without regard to fault, for all remediation costs and for all direct and indirect damages."  § 22a-134b.

Viewed in this light, the Report informed Adelphia that the Waterbury Property comprised an "establishment" within the meaning of the Act, that there had been "releases" at the site with contaminant levels exceeding applicable criteria.  Because Adelphia had contracted to sell the Waterbury Property, a Form III filing was required to comply with Connecticut law.  Form III  creates legal obligations and responsibility to "contain, remove, or otherwise mitigate the effects of any discharge, spillage, controlled loss, seepage, or filtration of hazardous waste at the" Waterbury Property.  The Report, read in the context of the Act, served as a written notice asserting Adelphia's responsibility with regard to the releases at the Waterbury Property.

Therefore, under the terms of the insurance policy a "claim" was made against Adelphia, and the first issue is resolved in the affirmative.

**B. Reporting of the Claim**

The second issue is whether Adelphia substantially complied with its obligation to report the claim to Quanta during the policy period or the extended reporting period. *See Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 226 (Colo. 2001). The policy requires that "[t]he insured must report a claim . . . to [Quanta] at the address set forth . . . as soon as practicable and in any event during the policy period or any applicable extended reporting period." The parties have stipulated that the extended reporting period for the policy ran from September 1, 2006 through November 1, 2006.

Adelphia contends that it provided Quanta with notice of the claim in two separate documents. The parties stipulated that the later of the two documents was sent on or about October 27, 2006, within the extended reporting period.

The October 27, 2006 letter purported to gives notice of "two potential claims," stating, in relevant part, that according to Environ's Phase II investigation, the Waterbury Property:

> was operated as a vehicle body repair facility until 1982 and would likely have involved the use of paint products, cleaning solvents such as mineral spirits, ketones, alcohols, chlorinated VOC's, and vehicle related fluids, such as lubricating oil, brake fluid, body fillers, and grinding wastes. The Phase II report recommended additional investigation. Reports have been submitted to the Connecticut Department of Environmental Protection, and we are awaiting their response. At this time we do not know what the State might require and therefore cannot provide any estimate of potential remediation costs.

Quanta argues that this letter does not constitute notice of a claim because "further action by the State of Connecticut was required before liability, if any, would attach to Adelphia." That argument circles back to whether a claim had been made against Adelphia, which the Court has already determined. The parameters of Section V.A.1 of the policy requiring the reporting of a

claim are not complicated.  Adelphia, during the extended reporting period, informed Quanta that it had received an assertion of responsibility regarding the Waterbury Property, by mail at the address specified in the policy.  Adelphia substantially complied with its obligation to report the claim to Quanta during the extended reporting period.[6]

<strong>V.      Conclusion</strong>

The Court **GRANTS IN PART AND DENIES IN PART** the Joint Motion for Judgment **(# 28).**  As a matter of law, the Court concludes that a timely claim was made against Adelphia during the policy period and that Adelphia timely reported the claim to Quanta during the extended reporting period. To the extent that the parties have unresolved factual issues that require a trial, they parties are directed to begin the Preparation of a Proposed Pretrial Order, *see Docket* # 18, that will govern the trial of any remaining issues in this case and shall jointly contact chambers to schedule a continued Pretrial Conference.

Dated this 5th day of September, 2014.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge

---

[6]      The Court does not address Quanta's arguments to the extent that they are beyond the two issues raised in the Joint Motion for Judgment.